**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOSEPH M. MILLER,<br>Plaintiff,<br>—*against*—<br>JONINA HOLDINGS L.L.C., and CHRISTOPHER MINNETIAN,<br>Defendants. | 25 Civ. 00655 |

## COMPLAINT

Plaintiff Joseph M. Miller for his complaint against defendants Jonina Holdings L.L.C. ("Jonina") and Christopher Minnetian alleges as follows:

## INTRODUCTION

1. Defendant Jonina is a real estate investment vehicle owned 90% by Defendant Christopher Minnetian and 10% by Miller. The organizational documents allow Jonina to "call" Miller's equity interests by paying him "Book Value," which is defined as the valuation of Miller's equity based on the most recent "mark to market" prices. Jonina has issued a notice proposing to exercise this right for ***$1***—a preposterous figure given the substantial value underlying Jonina. Miller brings this suit to hold Minnetian and Jonina to the terms to which they agreed, and to be compensated fairly for his equity.

2. Minnetian's effort to shortchange Miller represents one relatively small part of a larger plot, engineered by hedge fund manager Randall Smith in concert with Minnetian, to push Miller out of Smith-affiliated businesses at bogus, fire-sale prices. Miller has filed an earlier lawsuit relating to the largest of the Smith affiliated real estate businesses, Twenty Lake Holdings, LLC ("Twenty Lake"). That suit was filed in Delaware because the deal documents provide for disputes over that entity to be resolved there. The Jonina documents provide for

venue in New York, but the two disputes—and others that may have to be filed later—comprise a singular, overall scheme to push out Miller on the cheap.

3. The primary force behind the scheme, billionaire investor Randall Smith, hired Miller 14 years ago to manage Smith's real estate investments. Miller is largely responsible for creating and growing Smith's real estate business from scratch. The business is comprised of over a dozen LLCs in which Miller owns equity. The one entity at issue in this case—Jonina—is the vehicle by which Smith allows Minnetian, the president of Smith's family office entity, to take a participation interest in select real estate projects, effectively as a form of equity compensation for Minnetian's work.

4. The business partnership between Smith and Miller began after Smith's companies acquired a portfolio of newspaper businesses that collectively owned 42 buildings. Smith needed a real estate investment expert to devise a strategy for those investments—many of them underutilized and dilapidated buildings—that would help Smith earn back his investment and maximize his profit.

5. Miller had exactly the skills for the job, and Smith was eager to hire him. But Miller told Smith at the time that he was interested in being a business owner—not a mere employee—so Miller was soon given profit-sharing rights and, today, equity interests in the various entities. This arrangement aligned the interests of Miller and Smith: as Miller became more successful generating returns for Smith's companies, Miller's equity would be worth more.

6. By any measure, Miller's work has been massively successful. Miller began with a collection of buildings of uncertain value, and—through restructurings, renovations, development, and other efforts by him and the team he hired and trained—turned the portfolio into a huge profit center for Smith. For example, Miller's work has led to over $1 billion in direct

cash proceeds or lease savings to Smith's companies. Miller also built an operating platform that oversaw, executed, and managed transactions worth over $5 billion dollars tied to 75 million square feet of property and thousands of transactions—a scale on par with other major players in the real estate industry. Today, the Smith companies Miller ran own real estate assets worth at least thirty times the value of the original newspaper properties from which the business started.

7. In October 2024, Smith informed Miller that it was time for their long partnership to conclude, and formally terminated Miller from the businesses. Miller was not terminated for "cause," and Smith did not accuse Miller of any wrongdoing. In fact, Smith suggested the two could work together again when Miller started his next venture.

8. The compensation due to Miller arises from his minority interests in the various LLCs comprising Smith's real estate empire—an empire built in significant measure by Miller. Upon Miller's termination, the documents generally allow Miller to "put" his interest back to the companies, or for the companies to "call" Miller's interests. This case concerns a "call" that Jonina issued.

9. The Class A Member of Jonina—Minnetian—was required to price the call based on the "Book Value" of the company as of the date of Miller's separation from the business, and the term Book Value is defined by reference to the company's "most recent mark to market" under the "valuation processes currently utilized." This language was intended to anchor the valuation in real-world business practices, preventing Jonina from "gaming" the valuation process to shortchange Miller. Similar language exists in various of the LLC Agreements, and Miller was comfortable agreeing to this phrasing, precisely because it would ensure his exit payment would be rooted in the company's established processes.

10. But Jonina and Minnetian—acting at Smith's direction—have attempted to game the valuation considerably, with a brand-new methodology designed to minimize the payout. This is not how the call is supposed to work. Jonina's assets were managed by the primary Smith real estate entity, Twenty Lake, which marked the asset values on a monthly basis by analyzing broker quotes, comparable transactions, and the like. Other ordinary course valuations are reflected in third-party appraisals the company has commissioned for financing and other purposes. These types of real-world numbers, which Minnetian reviewed regularly, are supposed to control the Book Value calculation and would imply a payout to Miller of at least $500,000 and possibly in excess of $1 million. Jonina's $1 valuation for Miller's equity is not consistent with the LLC Agreement, and is plainly the product of bad faith. This suit is intended to hold Jonina and Minnetian accountable, and to make Miller whole.

## THE PARTIES

11. Plaintiff Joseph M. Miller is a commercial real estate investment professional and resident of Stamford, Connecticut.

12. Defendant Jonina is a limited liability company, with two members: Defendant Minnetian, a resident of New Jersey, and Miller, a resident of Connecticut.

## JURISDICTION AND VENUE

13. This Court has diversity subject matter jurisdiction under 28 U.S.C. § 1332(a)(1) because this is a suit between citizens of different States, and because the amount in controversy exceeds $75,000, exclusive of interest and costs.

14. This Court has personal jurisdiction over Jonina and Minnetian, and venue is proper in this judicial district, because the parties agreed in § 27(b) of the Second Amended and Restated Limited Liability Company Operating Agreement of Jonina Holdings L.L.C. (the

"Jonina LLC Agreement") to submit exclusively to the jurisdiction and venue of courts in New York for any action "relating in any way" the Jonina LLC Agreement, and further agreed to waive any objections to the Court's jurisdiction or to venue for any action brought in the New York courts.

## FACTS

**The Partnership Between Randall Smith and Joseph Miller**

15. Randall Smith is the founder and controlling owner of hedge fund Alden Global Capital ("Alden") and his family office entity, Smith Management, LLC ("Smith Management"). These and other Smith-affiliated companies have an investment strategy focused on (among other things) turning around distressed newspapers.

16. The first major newspaper acquisition was Alden's 2011 purchase of the Journal Register Company, which, at the time, owned newspapers in the Philadelphia and Cleveland metro areas, and in Connecticut and upstate New York. Smith's companies also invested in, and ultimately gained a controlling stake in, MediaNews Group, the owner of (among others) *The Denver Post*, *Boston Herald*, and *San Jose Mercury News*. More recently, in 2021, Smith affiliates bought the Tribune Publishing Co., the owner of (among others) *The Chicago Tribune*, *The New York Daily News*, and *The Baltimore Sun*.

17. Joseph Miller is an experienced commercial real estate investment professional who, before joining forces with Smith in 2011, had worked on more than $5 billion worth of transactions for the New York City developer, Rockrose. Miller also has a Master's Degree in Real Estate Development and an M.B.A. from Columbia University. Miller and Smith became acquainted socially and would frequently discuss their businesses and real estate.

18. In 2011, after the Journal Register acquisition, Smith asked Miller to manage the real estate assets that Alden had just acquired. The underlying newspapers owned 42 real estate

assets, and Smith needed a creative commercial real estate investment professional to assess where value could be unlocked and execute a strategy to do so. Miller brought real estate experience and skills Smith needed in sales, leasing, development, management, tax, construction, valuation, acquisitions, operations, zoning, and financing required to unlock and create substantial value. But Miller was interested in running his own business, and not in being only an employee. Smith promised Miller that he would eventually have a role as an owner and partner in the business, and so Miller started what would become a long and successful partnership with Smith.

19. Miller's first role was as a Vice President with Digital First Media (the entity that operated the Journal Register) in charge of the Journal Register real estate assets. In Miller's first 18 months, he spent most of his time on the road, visiting the properties and assessing how to best create value. He would ultimately visit over 120 localities where portfolio properties were located. At the same time, Miller had to build and train a real estate team from scratch. Smith trusted Miller to develop and lead the strategy because, as Miller understood things, Smith saw Miller as a partner.

20. In 2013, Miller and Smith agreed that Miller's team would become a separately spun-off real estate business—what became Twenty Lake—so that Miller would have the partner/owner role he was originally promised. In April 2013, the predecessor to Twenty Lake was formed and seeded with the Journal Register real estate assets.

21. The initial strategy was to house the real estate assets under one company that could manage them more efficiently and obtain financing that was often unavailable (or more expensive) when the real estate was owned by distressed newspaper businesses. Miller was given profit sharing rights, and—following a restructuring whereby the Twenty Lake predecessor was

sold to a Smith family trust ostensibly controlled by Smith's wife, Barbara Smith, as trustee—a formal equity stake in Twenty Lake. He was also given similar equity interest in various affiliated LLCs, including Jonina, whose assets were managed by Twenty Lake under Miller's direction.

**Miller Succeeds In Unlocking Massive Value For Twenty Lake**

22. Miller's tenure was unquestionably a huge success. Miller started with a portfolio of troubled newspaper buildings, and, through grit and creativity—and a staff he hired and trained over the years—turned those initial real estate investments into an engine of profit.

23. By way of illustration, Miller oversaw the rezoning and renovation of the *New Haven Register* building in Connecticut, which today is a 150,000 square foot "destination" store, Jordan's Furniture (part of Warren Buffet's Berkshire Hathaway), with restaurants, a ropes course, and a "sleep lab." *See Jordan's Furniture brings Buffett, ziplines and hooplah to New Haven*, NEW HAVEN REGISTER (Dec. 10, 2015). The building was eventually sold for a multiple of its purchase price, and those funds were then reinvested in the business.

24. The profits from this and thousands of other transactions allowed Miller to expand the Smith real estate empire well beyond old publishing buildings. For example, in 2021, Twenty Lake (and affiliates) purchased a property with approximately 244 luxury apartment units in Huntsville, Alabama. The property was under severe distress, and so Twenty Lake was able to buy it at a steep discount. Miller and Twenty Lake then turned the property around, dramatically increased the property's occupancy and revenue, so that it could be sold two years later, netting a 300% return on investment.

25. As of 2024, Twenty Lake owned, operated, and managed ten million square feet of real estate in forty states, including properties in sectors ranging from industrial, student

housing, residential, hospitality, retail, and office space. The company has bought, sold, financed, and developed over 500 properties, collectively worth billions.

26. The growth has paid off handsomely for Smith. Twenty Lake has generated hundreds of millions in profit since its inception in 2013. In 2023 alone, the profit from Twenty Lake's real estate transactions was approximately $75 million.

**Jonina And Minnetian**

27. Minnetian started working for Smith approximately one year after Miller, in 2012. Minnetian is trained as a lawyer, and is the President of Smith's "family office" entity, Smith Management. In that capacity, Minnetian and Miller have worked together extensively over the years, and have generally had a positive working relationship.

28. In or about 2021, Smith proposed that Minnetian be compensated in the form of an equity interest across a wide range of Smith-affiliated entities. Minnetian suggested that the equity be focused on real estate assets because, as he told Miller, Minnetian thought that Miller's portion of the overall business was the most promising. Smith ultimately gave Minnetian a 5% equity interest in Twenty Lake and, later, allowed Minnetian to participate further in select real estate projects. The vehicle for these "one-off" real estate participations is Jonina.

29. Miller was allocated 10% of Jonina (the same ownership position he held in Twenty Lake) so that Jonina's participation in any particular transaction would not affect the economic interests of Miller. This arrangement aligned the interests of Minnetian and Miller: if Minnetian wanted Jonina to participate in a transaction, the decision would not dilute Miller's 10% interest or work to has disadvantage.

30. Jonina has participated in several real estate projects alongside Twenty Lake that, by any fair assessment, are highly valuable. These include, for example, a former Greyhound bus terminal in Richmond, Virginia that is being torn down and converted into a 650-unit apartment

complex with retail stores, a former gun factory in Alabama, and two buildings in a highly desirable location in Downtown Dallas. These and other properties were bought at distressed prices and are being redeveloped in ways that will ultimately provide a massive cash profit upon exit, likely in excess of $50 million (with Jonina's interest ranging from 10% to 49% per project).

**Smith Decides To Terminate The Partnership**

31. On October 15, 2024, Smith informed Miller that their long partnership was over, and sent an official letter to that effect to Miller on October 22, 2024.

32. The reasons for Smith's decision were not perfectly clear. He told Miller it was time to "move on," but nothing in Smith's conversation with Miller, or in the formal notice that followed, indicated that Miller was being terminated for any misconduct or for "cause." To the contrary, when Smith informed Miller of the decision, Smith encouraged Miller to reach out when Miller formed his next real estate venture, so that the two might work together again. Smith added that he expected the separation to be "fair and friendly." Unfortunately, it turned out to be neither.

**Jonina Proposes To Buy Out Miller For $1**

33. The Jonina Agreement provides that the company, within 90 days of Miller's termination, can deliver a "Repurchase Notice" calling for "up to all" of Miller's equity to be repurchased, at a price based on its "Book Value" as of the date of Miller's termination. The Repurchase Notice is required to be accompanied by an "unaudited statement setting forth the Company's calculation of Book Value of [Miller's] Units as of the end of the applicable fiscal quarter[.]"

34. "Book Value" is defined as "the members' equity based on the most recent mark to market set by the Class A Member, in accordance with the valuation processes currently utilized[.]"

35. By defining Book Value with reference to company's "most recent mark to market" values and the "processes currently utilized," the LLC Agreement was designed to provide an objective methodology, anchored in values used in the ordinary course, for measuring Miller's payout. Miller would not have agreed to a language giving the Class A Member (Minnetian) discretion to contrive new valuation methodologies to underpay Miller. In fact, he agreed to this language because, at the time the LLC Agreement was drafted, there was an established valuation process that he knew would ensure a fair and objective measure of any exit payment. Miller was also made comfortable by the company's regular valuation practices, which included ordering formal third-party appraisals for banks and lenders, and conducting required valuation reporting on specific properties and the equity value for relevant parent level guarantors.

36. On December 6, 2024, Jonina issued a Repurchase Notice, claiming that the Book Value as measured on the date of Miller's termination (October 22, 2022) was $1. No calculation (or substantiation) for that figure was provided at the time, even though the LLC Agreement required Jonina to provide a statement setting forth the Book Value of Miller's equity.

37. On December 19, 2024, Jonina issued a second Repurchase Notice and asked that Miller "disregard" the first. The revised notice still set the exit price at $1, but attached a bare bones balance sheet indicating negative equity value for Miller's interests. This type of document, to Miller's knowledge, is not something ever used in the ordinary course of Jonina's business.

38. A properly calculated figure, rooted in real-world valuations business practices, would result in a dramatically higher payout. The starting point would be valuation “marks” that Miller’s investment management team of over 20 commercial real estate investment professionals at Twenty Lake compiled each month as to each property. (The management of the underlying properties, including those owned in part by Jonina, was done through Twenty Lake.)

39. The team collectively has over 250 years’ real estate investment experience. Their marks are used to inform the overall real estate strategy and to ensure that the team is readily prepared to assess, and promptly respond to, offers from potential buyers. To establish these marks, the investment management team relies on quotes from brokers, data from proprietary databases, appraisals, and their analysis of transactions involving comparable properties.

40. Minnetian reviewed the marks regularly each month, with a particular focus on the ones in which Jonina participated (*i.e.*, the ones in which he had the most economic interest). In fact, Minnetian told Miller that he kept a “personal” spreadsheet of marks for his interest in Jonina and Twenty Lake, and often asked Miller for estimates on the assets Jonina owned. Miller recommended that Minnetian use the values generated in the ordinary course by Miller’s investment management team, organized and issued by accounting each month, which were also provided to lenders to secure financing. Upon information and belief, Minnetian’s personal spreadsheets reflect a huge equity valuation for Minnetian himself (and, hence, significant value for Miller as well).

41. The monthly ordinary course valuation marks for the Jonina assets would imply a payout to Miller of at least $500,000. In addition, Twenty Lake periodically obtains third-party appraisals of its properties (typically in connection with financing) and a sum of those appraisals

and/or the net discounted value of future cash flows would likewise imply a significantly larger value.

42. The $1 proposed price has no basis in any past practice of Jonina, Twenty Lake, or the Smith entities more broadly. Put simply, it does not reflect a serious or good faith effort at valuation.

43. The shortchanging of Miller with respect to Jonina is part of a broader pattern whereby Smith and Minnetian have tried to drastically slash the exit payments to Miller across the Smith enterprise. Smith-affiliated companies have, to date, issued shockingly low Repurchase Notices to Miller. One was for $2 (Blue Suede Charlottesville Management, LLC, a holding company for certain hotel interests), and three others were for $1 (Blue Suede Hospitality Group, LLC, another holding company for hotel interests; Twenty Lake TAV, LLC, a co-investment vehicle that participates in Twenty Lake projects; and Jonina).

44. For the largest of the entities, Twenty Lake, the Repurchase Notice proposed a price of approximately $3.5 million, even though Miller's equity is easily worth more than $20 million. Miller has filed a separate suit with respect to the Twenty Lake and Blue Suede Charlottesville Management, LLC Repurchase Notices in Delaware, where the LLC Agreements for those companies provide for exclusive jurisdiction. The events at issue in that case, and those here, are part of a common pattern.

45. With respect to all the entities (including Jonina), Smith has deputized Minnetian to deal with Miller on the valuation issues. Miller has asked Minnetian repeatedly for the backup support to justify the low valuations being offered. Each time, Minnetian has said that he would have to check with Smith, but doubted that Smith would be willing to share any documents. And none have been shared.

46. To the extent Minnetian has described the company's approach in oral conversations, it has become clear that the goal is to pay Miller as little as possible, in bad faith. For example, four of Twenty Lake's properties are newspaper buildings leased to Smith-affiliated newspapers, and Minnetian said that the marks on those had to be drastically reduced because Smith had the power to change the lease terms so as to decimate the value to Twenty Lake (*e.g.*, Smith could extend the term by decades and select an arbitrarily low, below market rent). Essentially, Minnetian was arguing that, because Smith had the power to artificially manipulate the leases, the buildings should correspondingly be valued at artificially low, manipulated prices. (In reality, lending and other practical constraints would prevent Smith from unilaterally manipulating lease prices.)

47. To further justify the rock-bottom valuations, Minnetian also described several instances where he sought what are essentially "fire sale" bids on properties that are not ready for sale. But, as far as Miller understands, those fire sales prices were used in the calculations. On top of that, Smith and Minnetian have apparently incorporated steep, artificial discounts (such as transaction costs far in excess of what would occur in reality), in at least one case resulting in a property value being slashed in half and others resulting in *negative* property values (where the debt exceeded the highly discounted real estate values).

48. At one point, Miller tried to reason with Minnetian that, since they were both equity holders, they ought to have aligned interests in a fair valuation process. But Minnetian, not bothering to conceal his bad faith approach, responded that the less Miller was paid, the more would be left over for Minnetian.

49. Minnetian has explicitly told Miller that Smith would under no circumstances overpay Miller "by a dime" on the properties, which conveyed the message to Miller that Smith

has a predetermined amount (or perhaps a range) that he is willing to pay, and that the valuation process is not focused on actually determining value, but on massaging the numbers in whatever way is necessary to achieve the outcome Smith decided from the start—*i.e.*, to ensure that Miller is not, in Smith's subjective view, overpaid.

50. Making matters worse, the company has tried to strong arm Miller into yielding to the artificially low numbers. On December 27, 2024, Minnetian's counsel sent Miller a proposed form of "Unit Transfer Agreement" for several of the entities (including Jonina), under which Miller would be forced to *agree* to the rock-bottom prices, and whereby he would issue to all Smith-affiliated businesses a general release that would effectively prohibit Miller from pursuing any claim for a shortfall. The fact that all the Unit Transfer Agreements were sent as a collection confirms that Smith is treating Miller's exit payments as a singular project—one aimed at pushing Miller out as cheaply as possible.

51. But nothing in the Jonina LLC Agreement required Miller to accede to the absurd $1 repurchase price, or to agree to the company's proposed one-sided terms for documenting the transfer. Miller stands prepared to transfer his equity to Jonina immediately, but he will not execute a form of Unit Transfer Agreement requiring him to waive his rights to pursue what he believes to be a drastic shortfall in the purchase price.

## FIRST CAUSE OF ACTION—BREACH OF CONTRACT

52. Miller incorporates the foregoing allegations as if fully set forth herein.

53. Based on the facts alleged above, Defendants Jonina and Minnetian have breached and/or repudiated the express terms of the Jonina LLC Agreement and have also breached their implied duties of good faith, insofar as they manipulated the valuation process so

that it was not a the product of a genuine assessment of value but instead reflected an effort to conceal the specifics from Miller and minimize his payout.

54. The Jonina LLC Agreement required that any Repurchase Notice set forth a purchase price based on the Book Value of Miller's equity as of his termination date, based on the most recent mark to market as calculated by the Class A Member, Minnetian, in accordance with the established valuation processes. But instead of doing so, Jonina and Minnetian, at Smith's direction, calculated a completely bogus, and drastically low, repurchase price in bad faith. Worse, Jonina and Minnetian demanded that Miller sign a Unit Transfer Agreement that, without any foundation in the LLC Agreement, would require him to simply accept the absurd $1 calculation and forever waive his right to pursue the shortfall.

55. Miller has been damaged as a result of the breaches above, and is entitled to an appropriate Order from the Court requiring that Jonina and Minnetian honor the Jonina LLC Agreement and make an appropriate payout (with interest) to Miller.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff Joseph M. Miller hereby demands

(a) damages against Defendants in an amount to be determined at trial, inclusive of interest, attorneys' fees, and costs;

(b) an Order directing Defendants Jonina and Minnetian to close the repurchase transactions at the appropriate repurchase prices; and

(c) such other relief as the Court deems just and proper.

Dated: New York, New York
January 22, 2025

Respectfully Submitted,

STEPTOE LLP

By: *_/s/ Charles Michael_*
Charles Michael
Andrew Saba
1114 Avenue of the Americas
New York, New York 10036
(212) 506-3900
cmichael@steptoe.com
asaba@steptoe.com